DEPARTMENT OF CONSERVATION v. CONNOR.

1. Eminent Domain — Necessity — Evidence — Park Purposes — Virgin Timber.
   Jury's finding of necessity for expropriating for park purposes several thousand acres of land upon which there was a virgin stand of timber, and in which defendant either owned the fee or only the timber rights, held, supported by the evidence.

2. Same—Park—Partial Expropriation.
   The value of a 43,000-acre park is not destroyed because acreage adjoining defendants' 4,590.79-acre tract is not expropriated in toto or in one proceeding for park purposes, especially where there is a roadway running to and through the property.

3. Same—Condemnation by State Agency—Venue.
   Proceedings to condemn land for public use, brought by State agencies and public corporations must be instituted in the cir-

cuit court of the county where the land is located (1 Comp. Laws 1929, § 3766 *et seq.*).

4. SAME—PARK PROJECT—ACQUISITION OF PART OF LANDS OTHER-WISE THAN BY CONDEMNATION.

Where park project comprised some 43,000 acres, in more than one county, and negotiations were under way to secure some of the lands either by purchase or exchange, it was unnecessary to include all lands even belonging to defendants in proceeding to condemn a tract containing some 4,590.79 acres in which defendants owned either the fee or timber rights, hence it was not error to amend petition to include a certain tract of land in county other than one in which proceedings were commenced.

5. SAME—PARK—STATUTES—DETERMINATION OF NECESSITY.

The mere statutory authorization for a 43,000-acre park is not determinative of the question of necessity for such a park in condemnation proceedings (Act No. 27, Pub. Acts 1944 [1st Ex. Sess.]).

6. SAME—PARK—INSTRUCTIONS—NECESSITY—COMPENSATION.

In condemnation proceedings relative to some 4,590.79 acres of defendants' lands for portion of 43,000-acre park, instructions to jury are approved where they first require jury to find whether or not a park of the kind and character proposed was necessary, and, if such public necessity were found, whether or not it was necessary to include therein all or any part of defendants' lands, without being influenced by fact that plaintiff desired the tract for park purposes, or had declared that it be acquired for the public or that an appropriation had been made for its acquisition, and that jury should determine amount payable for amount of property it found necessary to take.

7. SAME—FORM OF VERDICT—TIME FOR OBJECTION.

Complaint as to form of verdict in condemnation proceedings to condemn vast tracts of land for park purposes *held*, if meritorious, to be too late, where appellants prepared the form which first required jury to find necessity, which of defendants' lands it was necessary to take and the sums to be paid therefor, and question was not raised at time of submission of the matter to the jury nor until assigning reasons and grounds of appeal.

8. SAME—CHARACTER OF JURY—INSPECTION BY JURY—OBJECTIONS— NEW TRIAL—TIME.

Objections on defendants' motion for new trial that jury in condemnation proceedings of tract of virgin timber did not consist of persons who had knowledge of timber and that jury's one-day inspection was insufficient to examine defendants' 4,590.79-acre tract *held*, to have come too late, in the absence of a showing that appellants were precluded from participating in selection of jury where such complaints were not made during the trial nor showing made that balance of timber differed in character from part inspected by jury.

9. SAME—JURY FROM VICINITY OF PROPERTY CONDEMNED.

The questions in a condemnation proceeding are resolved by a jury of 12 freeholders residing in the vicinity of the property (Const. 1908, art. 13, §§ 1, 2).

10. SAME—AMENDMENTS.

In statute relative to condemnation proceedings, liberal provision is made for amendment in form or substance at any time after, as well as before, judgment confirming the verdict, whenever such amendment will not interfere with the substantial rights of the parties (1 Comp. Laws 1929, § 3774).

11. SAME—PARK PROJECT—AMENDMENTS—RESERVATION OF RIGHTS —EXPERT WITNESS FEES.

In condemnation proceedings to acquire 4,590.79 acres of defendants' holdings for use in a 43,000-acre park, it was not error to permit amendments to petition which reserved to defendants metallic mineral rights, a logging camp, water power, flowage and riparian rights, easements over an existing lumber railroad and bridge and an extension of the railroad and the inclusion of 154 acres belonging to one defendant in view of liberal provision as to amendments in pertinent statute, failure of defendant to object and allowance of a substantial fee for testimony of expert as to value of water rights which defendants had not anticipated would be excluded (1 Comp. Laws 1929, § 3774).

12. ATTORNEY GENERAL—POWER OF AMENDMENT—PRESUMPTIONS.

It must be presumed that when the attorney general or his assistant appears for a public agency, he acts within the scope of his authority in amending a petition which was signed on behalf of his principal in the first instance.

13. EMINENT DOMAIN—AMENDMENT—AUTHORITY.

The regularity of entire proceeding to condemn 4,590.79 acres in which defendants had either fee title or timber rights was

not affected by amendments made reserving beneficial rights to defendant for their use in removal of timber outside of the expropriated tract notwithstanding it tended to reduce amount of compensation to them for property taken by reason of the fact that it was not specifically shown that plaintiff authorized each of the amendments made by the attorney general (1 Comp. Laws 1929, § 3774).

14. SAME—EXPENSES OF DEFENSE—TAXABLE COSTS.

A defendant's expenses for preparing and establishing defense in court in a condemnation proceeding are not embraced within the terms of just compensation for land taken by eminent domain, taxable costs only being allowable.

15. SAME—ITEMIZATION OF DAMAGES.

Verdict of jury in condemnation proceedings was not fatally defective because it did not set forth the separate items of damages claimed by defendants, but designated a lump sum, where no statute is pointed out requiring such itemization and it does not appear defendants requested it when proposing form of verdict.

16. SAME—JURY—SUPREME COURT—EVIDENCE.

Condemnation procedure is in the nature of an inquest in which the jury is the judge of both law and fact and whose verdict will not be disturbed by the Supreme Court if supported by competent evidence and, as to value, within the range of the testimony.

17. SAME—EVIDENCE—VIEW OF PREMISES.

Since condemnation proceedings are inquisitorial in their nature, the jury is not limited to the testimony introduced by the respective parties, but may view the premises (Const. 1908, art. 13, §§ 1, 2).

18. SAME—OPINIONS AND ESTIMATES OF WITNESSES—VIEW OF PREMISES.

In condemnation proceedings the jury may listen to the opinion of witnesses, their estimates of value and their methods of arriving at conclusion expressed but jury may base its judgment as well upon view of the premises and are not to be interfered with, or dictated to, by the judge (Const. 1908, art. 13, §§ 1, 2).

19. SAME—DETERMINATION OF VALUE.

Determination of value in condemnation proceedings is not a matter of formulas or artificial rules, but sound judgment and discretion based upon consideration of all relevant facts in a particular case (Const. 1908, art. 13, §§ 1, 2).

20. SAME—DAMAGES—EVIDENCE.

Amount allowed defendants by jury for property rights in 4,590.79-acre tract, lumber railroad and bridge, sawmill and timber *held,* within range of conflicting testimony for respective parties ·in condemnation proceedings to acquire land for park purposes.

21. SAME—VALUE—EVIDENCE.

The annual report of defendant foreign corporation *held,* not .conclusive proof of value of its property in this State where company was conducting two logging operations, one of which was ·not involved in area affected by condemnation proceedings to acquire land for a vast park project.

22. SAME—LUMP SUM AWARD—STUMPAGE.

Consideration given by jury to testimony of expert witness in proceedings to condemn virgin timber stand, in evaluating stumpage, was not ascertainable in view of award in a lump sum.

23. SAME—VIRGIN TIMBER—VALUE—EVIDENCE—FINISHED LUMBER.

In view of the great uncertainties in the .lumber business it was not error, in proceedings to condemn a large tract of virgin timber for jury not to consider the valuation problem in terms of timber converted into finished lumber.

24. SAME—PRESENT VALUE.

In proceedings to condemn land which has a market value, the fact that the owner may contemplate putting his land to some use for which it would be worth more, does not justify an assessment of damages in excess of the market value at the time of its appropriation.

25. LOGS AND LOGGING—TIMBERLANDS—VALUE—EVIDENCE.

While the value of timber may be reflected in the lumber market, the results of a manufacturing process and current sales of converted timber are too remote for purposes of evaluating timber· lands in condemnation proceedings.

26. EMINENT DOMAIN—DAMAGES—EVIDENCE.

Award made in proceedings to condemn 4,590.79-acre tract of land containing a stand of virgin timber *held,* within the valuation placed thereon by plaintiff's witnesses ·although perhaps less than sum Supreme Court might have awarded.

27. SAME—REVIEW BY SUPREME COURT.

In reviewing judgment in condemnation proceedings the Supreme Court does not hear the appeal *de novo.*

28. SAME—AMOUNT OF AWARD—EVIDENCE—SUPREME COURT.

An award made by a jury in condemnation proceedings would not be set aside, even though the Supreme Court would have made a larger award had it been trying the cause, where the award is within the evidence which differed widely.

29. SAME—JURY—EVIDENCE—VIEW OF PREMISES.

In condemnation proceedings the jury is the judge of law and fact and its conclusions need not be based entirely on the testimony but it may use its own judgment and knowledge from a view of the premises and its experience as freeholders.

30. SAME—JURY JUDGE OF LAW AND FACTS—FUNCTIONS OF TRIAL JUDGE.

In condemnation proceedings the trial judge has not the power of control over the proceedings and verdicts possessed by him in common-law actions, and while he may confirm or set aside the award reported to him, he may not give binding instructions; the jury being judge of both law and facts.

31. SAME—JURY—QUESTIONS OF NECESSITY AND COMPENSATION FOR JURY.

In condemnation proceedings the questions of necessity and compensation must both be submitted to the jury which is guided by its view of the law and the facts (Const. 1908, art. 13, §§ 1, 2).

Appeal from Gogebic; Landers (Thomas J.), J. Submitted October 18, 1946. (Docket No. 64, Calendar No. 43,338.) Decided January 7, 1947.

Petition by Commission of Conservation of the Department of Conservation against Gordon Connor and Connor Lumber & Land Company, a Wisconsin corporation, to condemn lands for park. Verdict of necessity and just compensation. Defendants appeal. Affirmed.

*Foss O. Eldred,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Harry W. Jackson* and *Daniel J. O'Hara,* Assistants Attorney General, and *William F. Pellow,* Special Assistant, for plaintiff.

*R. B. Graves, Charles M. Humphrey* and *Charles M. Humphrey, Jr.,* for defendants.

BUTZEL, J. Act No. 27, Pub. Acts 1944 (1st Ex. Sess.) (Stat. Ann. 1945 Cum. Supp. § 13.790 [21] *et seq.*), provides for the acquisition and development of recreational facilities for park purposes in several defined areas in Michigan and specifically appropriates the sum of $1,000,000 for the acquisition of property in the Porcupine Mountain area consisting of certain large tracts of land in Gogebic and Ontonagon counties. The instant suit was brought by the commission of conservation of the department of conservation of the State of Michigan, plaintiff, for the purpose of condemning some of the property in the Porcupine Mountain area owned by the Connor Lumber & Land Company, a corporation, and Gordon Connor, the defendants herein. As no question is raised as to the legal right of plaintiff to seek condemnation of the property, we shall not discuss the various acts by virtue of which plaintiff has brought these proceedings. We limit our discussion exclusively to the questions raised by appellants.

The testimony discloses that the Porcupine Mountain area sought by plaintiff for park purposes is one of the most beautiful tracts of land in the United States. One witness described its unsurpassable scenic beauty as rivaling that of Switzerland. Its recreational and educational facilities are described by witnesses in unmeasured terms. It is sought in the present case to expropriate 4,590.79 acres of property on which there is a solid stand of timber. Defendants own the fee to 2,466.82 acres of this property together with the water flowage rights in the Presque Isle river, the riparian rights thereof and a railroad bridge crossing it, also such portion of

defendant corporation's logging railroad as extends over a small portion of the property. Defendants own the timber rights on the remainder of the property consisting of 2,123.97 acres, the fee of which is in the Keweenaw Land Company. According to Act No. 27, *supra,* the entire park as contemplated will have approximately 43,000 acres, the larger portion of which is located in Ontonagon county. A solid stand of virgin timber covers the property of defendant corporation. It is one of the few remaining stands of such size in Michigan. The timber consists largely of hemlock and to a lesser extent of various kinds of hardwood. Defendant Gordon Connor owns 154.80 acres of timberland in Gogebic county which plaintiff also seeks to acquire in this proceeding.

In the original petition filed, 299.15 acres in Ontonagon county were included but, by appropriate amendment, were excluded on motion at the hearing of the case. By another amendment and motion, the 154.80 acres of defendant Gordon Connor in Gogebic county were included.

Defendants' witnesses were in accord with those of plaintiff as to the beauty of the proposed park and many of its advantages; but they stoutly maintained throughout the entire proceedings there was no need whatsoever to include in the proposed park defendants' stand of timber for the logging and lumbering of which, as well as for other stumpage, defendants had constructed many facilities at considerable expense. In addition to the extension of the logging railroad and the building of a bridge, defendant lumber company owns a lumber camp on the property and a large sawmill some 15 miles distant from the property sought to be condemned. Defendants further claim that there can be but little permanence to much of the timber on the property

sought to be condemned as the timber is ripe for harvesting and some of the trees are rotting. Defendants contend, however, that a salvage can be obtained from the rotting trees if they are cut within a reasonable time. Defendants further show that the property is over 15 miles distant from the Porcupine Mountains. They contend that a very wide strip of virgin timber on each side of the roadway running through the property would more than suffice for educational and historic purposes. Plaintiff, however, claims that defendants' large stand of virgin timber has great historic value, will demonstrate a basic industry of northern Michigan, and will attract a large number of tourists to this forest part of the park. Plaintiff showed that part of the property fronts on Lake Superior, and includes the picturesque Presque Isle river and gorge. In the last analysis, the question of necessity of expropriating defendants' property was one for the jury. Each side presented a long array of exceptionally well-qualified witnesses. The jury found for necessity. Its verdict is sustained by the evidence.

The jury awarded defendant lumber company the sum of $211,872.30, and defendant Gordon Connor $4,774.10, as just compensation for the taking of their properties. Defendants raise many other questions on appeal.

(1) Appellants claim that the court and jury did not have jurisdiction to determine the question of the necessity of establishing the proposed park without including all other owners of property within the area of the proposed park. This would mean joining a large number of owners of property in Ontonagon county in a suit brought in Gogebic county. The acreage of defendants is slightly over 10 per cent. of the entire acreage proposed for the park. Defendants' property adjoins a county park.

A roadway runs to and through the property and while it undoubtedly would be desirable to combine all parts of the park, the value of a 43,000 acre park is not destroyed because adjoining acreage also described in Act No. 27, *supra,* is not obtained *in toto* or in one proceeding for park purposes. In fact, if the various large areas devoted to park purposes are joined together by a roadway or a still wider strip of land, their particular value or that of the park as a whole is not destroyed. In the original petition it was sought also to condemn 299.15 acres of adjoining timberland belonging to the defendant company and situated in Ontonagon county. When the attorneys for plaintiff moved to amend the petition so as to exclude the Ontonagon county acreage, defendants' attorney not only did not oppose the motion, but on behalf of defendants intimated that there would be no necessity for a further condemnation proceeding in Ontonagon county and that the same measuring stick might be used in arriving at the value of defendants' property in Ontonagon courts as would be determined in the instant suit to condemn the Gogebic county property. Defendants, however, now take the position that the court had no jurisdiction to condemn only part of the property designated in the statute, Act No. 27, *supra,* for the proposed park. In 1 Comp. Laws 1929, § 3766 (Stat. Ann. § 8.14), in providing for condemnation by State agencies and public corporations, it is stated that the necessary proceedings should be instituted in the circuit court of the county where the private property sought to be taken is located, et cetera. If full credence were given to the testimony of one of the witnesses of defendants that the value of their properties sought to be condemned in this proceeding were worth in excess of one million dollars, when and if converted

into lumber, and this were the proper method of evaluating the timber, it would follow that no other property than that of defendants could be acquired at the present time, as the appropriation under Act No. 27, *supra,* for the entire area consisting of approximately 43,000 acres is only one million dollars.

Defendants call our attention to the case of *City of Allegan* v. *Iosco Land Co.,* 254 Mich. 560, where proceedings were brought under 1 Comp. Laws 1929, § 3784 *et seq.* (Stat. Ann. § 8.41 *et seq.*), a different act, by virtue of which proceedings were brought to acquire property for building a dam and acquiring the flowage rights over 1,500 acres of land. The Court properly held that this was an indivisible undertaking. It could serve no purpose to condemn only part of the property which would be useless unless the balance of it were also expropriated. Other cases cited by defendants likewise are distinguishable.

In the present case, it was stated that negotiations were under way to secure without condemnation proceedings necessary tracts in the park area, that the State already owned 1,000 acres of the proposed tract in Ontonagon county, and that it had or was arranging for the exchange of other lands owned by the State for a very large acreage in the proposed park area in Ontonagon county belonging to Federal and State agencies, as well as others. The present suit would not preclude bringing other condemnation suits if it became necessary. It was proper to exclude the portion of the property in Ontonagon county as described in the original petition. It was not necessary to include all the property as set forth by Act No. 27, *supra,* in the present proceeding. Defendants' claim of a jurisdictional defect has no merit. See *In re Petition of City of Detroit for Condemnation of Lands for Airport,* 308 Mich.

480, and *In re Huron-Clinton Metropolitan Authority's Petition as to Belleville Lake Park Project,* 306 Mich. 373, for authority to exclude certain parcels from a pending condemnation proceeding.

(2) Defendants claim that the verdict was fatally defective in not first determining the question of necessity of establishing a public park. All parties agree that the mere statutory authorization for such a park is not determinative of the question of necessity. The judge specifically instructed the jury in no uncertain terms that it was necessary for them first to determine whether or not there was a public necessity for a park of the kind and character proposed, and second, if such public necessity were found, then to further determine whether or not it was necessary to include in such proposed park all or any part of the property of defendants as described in the petition and shown on the various maps received in evidence. He also instructed them that they could designate what, if any, portion of defendants' property was necessary for park purposes. The judge further cautioned the jury that they were not to be influenced by the fact that plaintiff desired this property for park purposes or that by resolution it had declared that it be acquired for the public, or that an appropriation had been made by the State legislature for the acquisition of such property. He also instructed the jury that if they decided it was necessary that the State have a park such as proposed, and that it was necessary to include in such proposed park the whole or part of defendants' lands, then they would have to determine what should be paid defendants as just compensation for the property which they determined it was necessary to take.

Defendants contend that the form of the verdict furnished to the jury did not provide for answers to

these questions. The form contained the questions and with blank spaces for the answers to be filled in by the jury. Part 1 reads as follows:

"We find that it is ———— necessary to take defendants' private property for the proposed park improvement."

The jury could either leave the space blank if they found necessity, or insert the word "not" if they found otherwise. Part 2 provided a blank space in which the jury was to fill in the answer to the question, what lands of the defendants did the jury find necessary to include in the proposed park. Parts 3 and 4 provided that if the jury found in answer to the foregoing questions that it was necessary to include any part of the lands of the defendants, then they were to fill in the blank spaces left for the insertion of the sums to be paid to defendants as just compensation for such property.

Unfortunately the form of the proposed verdict is not in the printed record, but it is included in the return to the Supreme Court from the clerk of the circuit court. We have examined the form and it appears, as claimed by appellee in its brief and not denied in defendants' brief, that the form of the verdict as submitted to the jury was prepared by defendants. It is typewritten and bound with a cover entitled "Form of Verdict," with the names and addresses of appellants' counsel printed at the bottom of the cover. It did contain some other questions but they were struck out with a pencil. Evidently the form of the verdict was carefully considered. The printed record discloses no objection to the form of the verdict at the time of its submission to the jury. Such objection appeared for the first time in defendants' assignments of reasons and grounds of appeal. The defendants

evidently regarded the answer to the first question as to whether or not it was necessary to take defend-, ants' private property for the proposed park improvement as determinative of the necessity 'of the public improvement itself.    Under the circumstances, their objection, even if it has any merit, comes entirely too late.    A timely objection might have resulted in submission of the question before, or at the time, the jury brought in its verdict in a form possibly more satisfactory to appellants' counsel.  *In re Jeffries Homes Housing Project*, 306 Mich. 638, 647, we stated:

"Some of the appellants further claim that while the jury found that it was necessary to take the property, it did not find that it was necessary to make the improvement.   The judge instructed the jury that if they found from the evidence presented that there was insufficient evidence to find a verdict of necessity, then the verdict must be of no necessity; that in determining the question of necessity, the jury must find whether or not the project was necessary, not whether it was necessary to take the land for the proposed project; that if it found that the construction of the project at the present time was not a public necessity, the verdict must be one of 'not necessary.'   We believe the jury was not in any way misled, and that their verdict covered both the necessity for the improvement as well as for the taking of the particular properties.   The form of the verdict followed the statute, 1 Comp. Laws 1929, § 3794 (Stat. Ann. § 8.51), and was approved in *Re Widening of Harper Avenue*, 237 Mich. 684."

(3)    Defendants, on a motion for a new trial, further claim error because the jury did not have ample opportunity to examine the very large tract of property in the one day devoted to that purpose. Gordon Connor, who is also manager of the Michi-

gan division of the Connor Lumber & Land Company, accompanied the jury. He made no objection to the fact that the jury's inspection of the property was limited in space and time. There is no proof that the timber differed in character from that inspected by them, nor was it shown that the jury could have accomplished more by the meticulous examination of more trees. The quantities were testified to by the witnesses of the respective parties, who were not all in agreement. A more careful examination by the jury, in all probability, would not have enabled them to estimate the correct quantity of timber. Defendants, however, claim that inasmuch as under the law the members of the jury may largely use their own judgment in evaluating property, they should have had more time to examine it. Criticism was also made as to the character of the jury, it being claimed that its members did not consist of persons who had knowledge of timber and for that reason a further examination of larger sections would have been helpful. The questions in a condemnation suit are resolved by a jury of 12 freeholders residing in the vicinity of the property. Article 13, §§ 1 and 2, Constitution of the State of Michigan. Appellants make no claim that they were precluded from participating in the selection of the jury. Appellants claim that freeholders in the vicinity of the property would not know any more of its value than a city resident would know of a manufacturing industry for which the city might be famous. As we shall later show, appellants argument would have more force were the method and cost of manufacturing lumber something for the jury to consider. Such objection of appellants even if it had any merit came too late. Their counsel, if dissatisfied, should have made timely objection or

moved the court that the jury visit the area not covered on their first visit, or revisit it for a longer period.

(4) Defendants further contend that the proceedings were fatally defective because by a number of amendments certain property and rights were excluded after appropriate motions were duly made by plaintiff and granted by the court. Defendants claim that such property and rights could not be excluded without the official act of the commission of conservation. The motions as granted provided that there be excluded from expropriation and there be reserved to defendants: (1) the metallic mineral rights; (2) a logging camp; (3) water power, flowage and riparian rights; (4) easements over the existing lumber railroad and bridge; (5) and an easement for the extension of the lumber railroad so as to reach other property of defendants if they so desired. A motion was also granted for the inclusion of 154 acres of land, belonging to defendant Gordon Connor, to which we have hereinbefore referred.

Act No. 149, Pub. Acts 1911 (1 Comp. Laws 1929, § 3774 [Stat. Ann. § 8.22]'), makes liberal provision for amendments in form or substance at any time after, as well as before, judgment confirming the verdict of the jury whenever the amendments will not interfere with the substantial rights of the parties. Defendants make no claim whatsoever that the amendments were to their detriment. They made no specific objection to them. In fact, counsel for defendants assisted in defining the railway right of way covered by the motion. On the motion to exclude the water rights, attorney for the defendants objected to the fact that the amendment was not broad enough so as to reserve riparian rights to defendants, and the amendment was then redrafted

so as to meet the approval of counsel for defendants. They now object to the regularity of the entire proceedings on the ground that the amendments were not made by the commission of conservation. It must be presumed that when the attorney general or his assistant appears for a public agency, he acts within the scope of his authority in amending a petition which was signed on behalf of his principal in the first instance. One of the most important amendments made referred to excepting water rights and the assistant attorney general stated that he had been authorized to exclude the water rights. The other amendments were for defendants' benefit without in any way detracting from the value of the properties for park purposes. By the amendments defendants retained full use of certain facilities erected on the property so as to assist in the removal of their timber outside the park area. They kept other rights in the park area which are of great value. The retention of all these rights and easements by defendants undoubtedly tended to reduce the amount of the compensation they would otherwise be entitled to. Because defendants had not anticipated that the water rights would be excluded and, therefore, at some expense had brought an expert witness to testify to their value, the court properly allowed defendants a fee of $1,000 to be paid irrespective of the outcome of the case. Defendants' claims of error in regard to the amendments are of no merit.

(5) Defendants claim that there should have been included in the amount of compensation they were entitled to, not only the value of the property taken, but also defendants' expenses for preparing and establishing their defense in court. Defendants call attention to certain cases from other jurisdictions. Plaintiff denies that these cases uphold

defendants' contentions. It would serve no useful purpose to discuss the cases. The law of Michigan does not provide for payment of more than the taxable costs. Expenses such as are claimed by defendants are not embraced within the terms of just compensation for land taken by eminent domain. *Dohaney* v. *Rogers, State Highway Commissioner of Michigan,* 281 U. S. 362 (50 Sup. Ct. 299, 74 L. Ed. 904, 68 A. L. R. 434).

(6) Defendants now complain that the verdict of the jury was fatally defective because it did not set forth the separate items of damages claimed by defendants, but only designated a lump sum as compensation. They do not point to any statute that necessitates such itemization. The record does not show that in proposing the form of the verdict defendants requested any findings as to separate items of compensation. The objection, if it had any merit, comes too late.

(7) Appellants claim that the amounts of the awards are inadequate and below the minimum amounts established by any competent testimony. The case followed the pattern so frequently found in condemnation cases. The plaintiff produced experts who placed a low but possibly a true valuation on the property, while the defendants' experts placed it at an exceedingly high but possibly true figure. In this instance defendants' leading witness placed what evidently appeared to the jury as such an extravagantly high figure that they may have resented it as overtaxing their credulity. It would be interesting to speculate upon the various factors that influence the minds of jurors in arriving at a verdict. This we cannot do. Appellants criticize the power of a jury in making their own determinations of value from the evidence and their own observations. While the condemnation procedure

has been described as archaic and unjust and some futile efforts have been made to change it (see Report of the Judicial Council of Michigan, January, 1931), we follow it as prescribed by the Constitution and statutes. It still is in the nature of an inquest. The jury is the judge of both law and fact, and a verdict will be upheld in this Court if it is supported by competent evidence as long as the amount is not lower than the minimum, or higher than the maximum valuation placed by the witnesses on the property sought to be condemned.

(8)   Before discussing the conflicting testimony in regard to values, we shall briefly review some of the cases in this State. In *Re Brewster Street Housing Site,* 291 Mich. 313, Mr. Justice POTTER discussed the subject very fully. He stated therein at page 343:

"It is contended, however, the trial court erred in its rulings upon the admissibility of testimony. Proceedings for the condemnation of property are not tried before a court. The constitutional tribunal here involved was a jury of 12 freeholders residing in the vicinity of such property. They were charged by the Constitution of this State, with the duty to determine whether there was a necessity for using such property sought to be taken, and if they found there was a necessity for taking such property for a public use, to fix the just compensation to be made therefor. This seems plain from article 13, § 2, Const. of 1908. Proceedings under this section of the Constitution, therefore, will not be reviewed in the same manner as if the proceeding were one tried before a court and jury according to the course of the common law."

This was followed by a long list of authorities and excerpts from opinions of this Court. He also stated in *Re Widening of Michigan Avenue, Roosevelt to Livernois,* 280 Mich. 539, 547:

"From the very nature of the constitutional provisions, the jury is judge both of the law and facts. * * *

"The proceedings, being inquisitorial in nature, the jury is not limited to the testimony introduced by the respective parties, but may view the premises. * * *

"The jury may listen to the opinion of witnesses, their estimates of value and their methods of arriving at the conclusion expressed. But the jury is not bound by the testimony alone. They are to exercise their judgment, based not only upon the testimony but their own knowledge gained from a view of the premises. They are not to be interfered with or dictated to by the judge. The jury are judges both of the law and facts. * * *

"Many technical rules have been promulgated for determining value, none of which is important. The determination of value is not a matter of formulas or artificial rules, but of sound judgment and discretion based upon a consideration of all the relevant facts in a particular case."

There seems to have been but little dispute over the claim that the land shorn of the timber was worth $1.75 per acre. The witnesses for the respective parties, however, are in total disagreement both as to the correct quantity of the timber and the amounts to be awarded defendants as just compensation. There are many facts indicated by the record that they may have influenced the jury. The attorney for defendants in his opening address characterized the timber as "mature," and stated that "it has reached its growth," that "a goodly portion of it has outlived its span of life, is dying," and that "too many of the trees are past harvest time." The respective parties employed well qualified cruisers of experience and standing. Those for plaintiff testified there were 37,856,000 feet of timber, while those for defendants claimed there were

55,288,000 feet, a difference of over 17,000,000 feet. Possibly the cruisers for plaintiff left out dead timber for which defendants claim some value. The question of the amount of timber was one of fact. The jury evidently believed the cruisers for plaintiff.

The testimony as to what sums should be awarded defendants for just compensation is in still greater conflict. Testimony was given in regard to other factors which defendants claimed enhanced the value of the timber. The value of the railroad bridge spanning the Presque Isle River was set at $25,300. Under the amendment defendants retained an easement in the bridge. Defendant lumber company owned in all 14,224.54 acres of contiguous timberland in this particular location so that the 4,590.79 acres sought to be taken in the present case amounted to 37.7 per cent. of the total volume of timber in defendants' acreage. The railroad was valued by witnesses at $172,396.53. Only three miles of the roadbed extends over the property herein involved. The balance of the roadbed and tracks extending over the other property belonging to the lumber company was valued at $137,896.53. An easement in the railroad over the three miles was retained by defendant company by the amendment. It can readily be seen that the jury may have placed very little, if any, value on the bridge or railroad in which defendant retained full use. The jury may have questioned to what extent defendants were being deprived of anything of real value under the circumstances. Defendants claim that they should have been fully compensated for the bridge, the three miles of railroad, and also 37.7 per cent. of the value of the balance of the railroad on property retained by defendant. The defendant company owns a sawmill at Connorville, Michigan, about 15 miles from the area sought to be condemned. It asserts

its value is $150,000, and contends that inasmuch as plaintiff is taking 37.7 per cent. of defendants timber or stumpage in this particular locality, it should also pay 37.7 per cent. of the value of the sawmill, claimed to have been built to convert the timber from this particular property. It is not shown that the company cannot use the sawmill to convert other logs which it may own or may acquire from others, in addition to the 9,633.75 acres it still will have left in this particular area after the condemnation proceedings. It is not shown that the sawmill cannot convert timber for others or that it cannot be dismantled and a large salvage obtained.

The testimony developed the fact that the defendants derived the title to the timber property from the R. Connor Company. In 1932, the latter company was taken over by a creditors' committee. The sawmill was completed in 1935. Both companies were forced into bankruptcy and sought reorganization under section 77b of the national bankruptcy act in 1935. The jury may have considered also that the sawmill was over 10 years old, had continued in operation during that time and was able to get a supply of logs to manufacture into lumber. The jury may not have allotted any compensation for this sawmill. The business misfortunes of defendant company may have been due to an expansion greater than its capital would permit, as claimed; nevertheless, the jury may also have been impressed with the belief that the lumber business might not be as profitable as defendants' witness claimed it would be. Defendant itself brought out the facts relating to the bankruptcy proceedings.

In 1941, defendant lumber company deeded 63.93 acres of the timberland to the board of county road commissioners for the sum of $3,194.58, or for less than $50 an acre. This, however, sets no criterion of value as the lumber company retained certain ease-

ments, *e.g.*, the right to cut the timber, and received the benefit of a road to be opened by the county. A map of the property shows a road near the railroad right of way. One of the plaintiff's witnesses testified that the logs could be moved by truck over the road or by water. The record does not show when the road was built, but the jury may not have been impressed with the value of the three miles of railroad by reason of the availability of the road and also because the lumber company retained an easement in the railroad.

What may have also impressed the jury was the lumber company's annual report to the Michigan Corporation & Securities Commission for the year ending August 31, 1942. In this report the company, a Wisconsin corporation, segregated its property in Michigan from that in Wisconsin. In addition to its cash, receivables and large inventories, it stated its other assets in Michigan consisted of "property under contract," of the value of $703,794.81. It had purchased this property on contract from the R. Connor Company. Apparently the sawmill now claimed to be worth $150,000, the bridge and the entire railroad now claimed to have a value of $197,696.53, were included. Thus, if the company owned no other property in Michigan this would leave the timberlands valued at approximately $356,000, 37.7 per cent. of which would be considerably less than the jury awarded defendant company. The record, however, shows that the company was conducting two logging operations in Michigan. We do not believe, therefore, that this annual report is conclusive proof of value; but it may have had some probative force with the jury.

Appellants base their claim of error largely on the allegedly improper method used by plaintiff's expert witnesses in evaluating the stumpage, which, it is claimed, did not make sufficient allowance, if

any, for the bridge, the three miles of railroad, et cetera. They contend that these facilities together with the sawmill, not too far distant from the area involved, gave the stumpage an enhanced value to the defendants, and that this was not taken into consideration by plaintiff's witnesses or the jury. The facts and claims were fully brought out by witnesses for defendants. Just what consideration the jury gave to them or how much they allowed because of them we cannot tell from the lump sum awarded by the jury.

(9) Appellants claim that the jury did not follow the judge's instructions in determining the just compensation by finding the value of the stumpage through the process of ascertaining the value of the lumber manufactured at the sawmill and then deducting the costs of manufacture, et cetera. In this regard, the judge's charge to the jury was far more favorable to defendants than they were entitled to. The question was what the stumpage was worth, not what it would be worth if and when converted into lumber at defendants' sawmill, or what would be realized for the lumber if sold for packing cases or other lumber products to the government or any other purchaser. This would be entirely too speculative and remote. The testimony in the instant case showed the great uncertainties in the lumber market and that at times the lumber business had been very unprofitable. The testimony did ascribe a distinct value to timber. The jury may have taken into consideration some of the extra elements of value defendants contend for, but no error can be claimed if the jury did not consider the valuation problem in terms of timber converted into finished lumber.

"If the land taken has a higher market value by reason of the minerals it contains, or by reason of a

use or uses for which it may be adapted, but to which it has not been put, the owner is entitled to the market value as so enhanced. But if there is a market value, nothing more than that can be recovered, and the fact that the owner may have contemplated putting his land to some use, in the future, for which it may have been worth more than it would bring in the market at the time it was appropriated, does not justify an assessment of damages in excess of the market value at the time of its appropriation." *Alberson Cemetery Association* v. *Fuhrer,* 192 Ind. 606 (137 N. E. 545, citing R. C. L.).

In *City of Detroit* v. *Hartner,* 227 Mich. 132, we quoted the correct rule as stated in *Pennsylvania, S. V. R. Co.* v. *Cleary,* 125 Pa. 442, 451 (17 Atl. 468, 11 Am. St. Rep. 913):

"It is proper to consider for what purpose it may be used to advantage, in order to determine for what price it will sell. It may be salable as a site for the erection of a hotel, a factory, a dwelling house or a wharf, but it is not proper to lay before the jury proof of what the hotel or other structure would cost, together with proof of the value of the lot with such structure upon it, and treat the difference between these sums as the value of the lot. Such method would be speculative and fanciful. Equally improper is evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. It is proper to inquire what the tract is worth, having in view the purposes for which it is best adapted, but it is the tract, and not the lots in which it might be divided, that is to be valued.   *   *   *

"The jury are to value the tract of land, and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor in deciding what price he

could afford to pay, would consider the chances and probabilities of the situation as then actually existing. A jury should do the same thing."

The value of timber may be reflected in the lumber market, but the results of a manufacturing process and current sales of converted timber are too remote for purposes of evaluating timberlands.

Many other criticisms are leveled against the testimony of plaintiff's witnesses. Almost all the witnesses who testified to the value of the stumpage were experienced woodsmen or men well qualified to give their opinions as to timber values. Appellants particularly complain of the testimony of Donald M. Mathews, professor of forest management at the University of Michigan, which position he has held for many years. He had long years of experience throughout the country and had done logging cost work for many large concerns. It is very possible that his testimony had much weight with the jury. He testified on rebuttal that the estimated value of the timber should be discounted 30 per cent. because of the number of years it would take to harvest it and the attendant risk and loss during these years. When asked how he arrived at this figure, he replied that he took into consideration the possibility of the market receding, or labor costs rising, and loss of timber through fire. He testified on cross-examination that this was merely a matter of opinion, and when asked by defendants' counsel, "Picked it out of the air?", he replied in the affirmative. He stated that over a term of five years, $262,650, would be realized, and that after deducting the 30 per cent. discount the net present worth would be $183,855. He found that the value per acre was $50 to which he added $7.88 per acre for the bridge and main line of the railroad east of the bridge and

$2.46 per acre for the last three miles of main line of the railroad west of the bridge, which part was located on the property being condemned.

Witnesses for both plaintiff and defendants testified that the logs should be harvested over a period of years. Another witness in referring to Gordon Connor's acreage stated that current stumpage prices should not be used as they were not justified, that the bulk of the timber could not be logged within the next 12 months; that if he were the buyer, he would take eight years to harvest the timber, and that he believed a 40 per cent. discount should be allowed to take care of the element of risk.

Another witness for plaintiff, after application of the 30 per cent. discount but adding, however, $25,300 for the bridge, $4,316.94 for the lumber company's land and $270.90 for Gordon Connor's land, stated that defendants were entitled to a joint award of $177,794.34, instead of $216,646.40, the amount awarded by the jury. One witness, defendants' accountant, calculated that over a four-year period of operation, defendants would be entitled to $1,183,380, subject to a small discount. This claim and the 1942 annual report filed with the Michigan Corporation & Securities Commission may well have persuaded the jury that defendants' figures were so inflated they could not be relied upon. A real estate dealer, who had some experience in logging and professed knowledge of the value of stumpage and who had negotiated the sale of other stumpage at or near the area involved, placed the value of the lumber company's acreage at $40 an acre, and Gordon Connor's acreage at $27.50 per acre. He did not discount these figures on account of the element of risk. Another witness placed the value at $40 to $45 an acre, and stated that he did not take the railroad

into consideration, as there was a good truck road, a gravel road, and the lake by which the lumber could be transported at considerably less expense. Defendants' witnesses placed a much higher valuation on the property.

The testimony of the various expert witnesses applies with equal force to the acreage of Gordon Connor. There was no road or railroad extending to his property, although logs could be transported by water. The acreage contains a comparatively small volume of merchantable timber. He did not intend to harvest it for a number of years. The award was within the valuation placed upon it by plaintiff's witnesses.

It would serve no useful purpose to discuss in greater detail the conflicting testimony set forth in a four-volume record, which we have carefully reviewed, except to state that witnesses for defendants placed a much higher valuation on the property, and particularly stressed the consequential damages defendants would sustain because of their superior facilities for transporting the logs and converting them into lumber. However, the verdict of the jury was sustained by the evidence. Plaintiff concedes that present stumpage values are not subject to discount, and that to determine such values the price obtainable for logs must be considered. Even though we disregard the testimony in regard to the element of discount, according to the testimony of two witnesses the value of the land and the timber is less than the amount awarded by the jury. We are bound by the jury's verdict although some of us might have awarded a larger sum to defendants.

(10) There are a number of guiding principles set forth in previous decisions of this Court that we bear in mind in coming to our conclusions in the

instant case.   We do not hear an appeal from a
judgment in condemnation proceedings *de novo*.   *In
re Petition of City of Detroit for Park Site,* 227
Mich. 132.   An award made by a jury in condemna-
tion proceedings should not be set aside, even though
this Court would have made a larger award had it
been trying the cause, where the award made is
within the evidence which differed widely.   *Com-
mission of Conservation of Department of Conser-
vation* v. *Hane,* 248 Mich. 473.   *In re Jeffries Homes
Housing Project, supra.*   Condemnation proceedings
are inquisitorial in nature and the jury is the judge
of law and fact.   Its conclusions need not be based
entirely on the testimony but it may use its own
judgment and knowledge from a view of the prem-
ises and its experience as freeholders.   *In re Park-
side Housing Project,* 290 Mich. 582.   *In re Widen-
ing of South Dix Avenue,* 262 Mich. 233; *Ontonagon
R. Co.* v. *Norton,* 236 Mich. 187; *In re Widening of
Bagley Avenue,* 248 Mich. 1; *In re Jeffries Homes
Housing Project, supra.*   We stated in *Re Owen and
Memorial Parks,* 244 Mich. 377, 379 (61 A. L. R.
190):

"But in condemnation proceedings the trial judge
has not the power of control   *   *   *   possessed by
the trial judge in common law actions.   He may, of
course, confirm or set aside the award reported to
him, but he cannot give binding instructions, and the
jury is the judge of both law and facts.   *   *   *
Under our Constitution, the question of necessity as
well as that of compensation is committed to the
jury, * and the jury reach their conclusion on both
questions guided by their views of the law as well
as their view of the facts.   *   *   *   If the right
there secured (under the Constitution) of a trial
of both questions involved in condemnation pro-

* See Const. 1908, art. 13, §§ 1, 2.—REPORTER.

ceedings by a jury is to be maintained, it must be maintained in its entirety; a jury may not settle one of the questions and the trial judge the other, if constitutional rights are to be observed."

We affirm the judgment on the awards as found by the verdict of the jury, with costs to plaintiff.

CARR, C. J., and BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred. DETHMERS, J., did not sit.