## PENN. SCHUYL. V. R. CO. v. M. J. CLEARY.

ERROR TO THE COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY.

Argued February 22, 1889—Decided April 15, 1889.

[To be reported.]

1. In a proceeding to assess damages for land taken for railroad purposes, testimony as to how many building lots the land under consideration could be divided into and what such lots would be worth separately, is inadmissible.

2. It is proper to inquire what the tract was worth, having in view the purposes for which it was best adapted, but it is the tract and not the lots into which it might be divided, that is to be valued.
3. Nor is it competent to show, in such proceeding, that the owner had declined to sell or lease the land, or the reasons he gave therefor, his view upon the subject not being relevant to the inquiry before the jury.
(*a*) An administrator bought land at a sheriff's sale, under a judgment obtained against his intestate (the prior owner of the land) in his lifetime; and, after the purchase, but before the execution, acknowledgment and delivery of the deed, a railroad company entered under the right of eminent domain.
4. In such case, the administrator had a title sufficient to authorize him to institute proceedings for damages in his own name, and whether his title was absolute or he held as trustee for the heirs, was determinable after the damages were fixed and the money paid into court.
5. A purchaser at sheriff's sale acquires an inchoate title in the land purchased, by virtue of his bid; the subsequent acknowledgment and delivery of the deed provides him with evidence of his title which relates to and takes effect as of the date of the sale recited.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and McCOLLUM, JJ.

No. 160 January Term 1889, Sup. Ct.; court below, No 17 July Term 1887, C. P.

On May 2, 1887, Malachi J. Cleary filed a petition for the appointment of viewers to assess damages, against the Pennsylvania Schuylkill Valley R. Co. for land taken by the company for railroad purposes. The viewers were appointed and filed their report, September 5, 1887, assessing his damages at $4,750. The petitioner appealed from the award, and it was agreed that the action should be in the form of an action of trespass, under the plea of not guilty.

At the trial on November 4, 1887, the following facts appeared:

The lot of land, over which defendant's road ran, formerly belonged to James Cleary, who died in 1882. His title descended to his heirs at law of whom the plaintiff was one, and to whom letters of administration were issued. The defendant company entered upon the land on July 31, 1885.

Plaintiff offered in evidence a sheriff's deed for this land, dated April 11, 1887, from B. J. Duffy, sheriff, to Malachi J. Cleary, acknowledged April 2, 1888; this to be followed by an

offer of a judgment by A. E. Beck obtained against James Cleary in his lifetime, together with a revival of the same against the plaintiff as administrator; issue of fieri facias and condemnation, venditioni exponas, and sale to the plaintiff on April 11, 1885, followed by the execution and acknowledgment of the deed.

Objected to by the defendant, because not showing title in the plaintiff at the time of the taking.

By the court: Objection overruled, offer admitted; exception.[1]

Daniel Crawshaw, called for plaintiff, testified that he owned property about half way between Nicholas street and the property in dispute, which property he had acquired in 1884. It was in lots.

Q. What did you pay for it? A. $300 a lot.

Objected to as immaterial.

Q. What are lots worth in that neighborhood? A. They are asking $300; that is what I paid that time; I do not know what they are now.

Mr. Farquhar asks that this testimony be stricken out.

By the court: Strike out as to what he paid. Let the rest stand; exception.[4]

John Buckley, called for plaintiff, testified as to his knowledge of the property for a long time, and on cross-examination stated that various projects had been suggested to utilize it for manufacturing purposes, but that Mr. Cleary was a peculiar man, and the property was in use all the time for the purpose of a truck farm and meadow. On re-direct:

Mr. Ryon: Q. It was also true that Mr. Cleary had refused to sell it to anybody? A. I know it only by Cleary's own declarations.

Objected to.

Q. You went on to tell in answer to the counsel's question, that there were several projects formed for the purpose of purchasing this property for manufacturing purposes. Do you know that to be a fact?

Objected to.

By the court: If you can show that Mr. Cleary refused to sell it for any purpose, that you can show.

Plaintiff proposes to show further that there had been

manufacturing projects originated, and for the purpose of purchasing this very property for manufacturing purposes, and Mr. Cleary would not sell it. If it is important for them to show that it was only used for a truck farm, it is important for us to show why, because the object of that question is to say to the jury that Mr. Cleary owned the land for 35 years and could not sell it.

By the court: That is all accomplished by proof of the fact that Cleary refused to sell the property. To that extent we will admit the offer; exception.[6]

The witness testified, under another objection and exception, that Cleary told him several times he would not sell the property while he lived.[7]

Testimony having been introduced in the defendant's case in chief, to show that the property lay idle and unproductive after Mr. Cleary's death, in the plaintiff's rebuttal, John A. Nash, who represented heirs interested in the property, was called and asked why the property was not leased by the heirs after the old gentleman's death.

Objected to.

Mr. James Ryon: We propose to prove that they refused to make any leases except to one or two parties who went in there for the mere purpose of taking care of the property; that a man by the name of Smith wanted to lease the property, and pay a very fair rent, that they declined to lease it to him; that they were holding the property for the purpose of cutting it up into town lots and selling it, but that they were not prepared to sell it at the time this railroad came on and took it; that they had not had it surveyed; that there was some preliminary work to do before they could put it into the market. The inference from the cross-examination of counsel as to the property being idle might be damaging with the jury, while if the jury understand the facts why it was idle, because these people refused to lease it, it would be an important element in the question of damages.

By the court: A refusal to lease after Mr. Cleary's death?

Mr. James Ryon: Yes, sir.

By the court: We think you can prove the fact that after Mr. Cleary's death they refused to lease to parties, to go into possession of it, because they wanted to reserve it for other

purposes, as an explanation of the fact that the place was unoccupied.    We will admit that; exception.[8]

Defendant excepts.    Bill sealed.

The court, GREEN, J., charged the jury, in part as follows :

[There is no doubt that Cleary was the owner of about three acres of land on the outskirts of the borough of Pottsville, near what is called the shoe factory, on the road leading from Pottsville to St. Clair, and that of this property about two acres were taken by the railroad company and about one acre was left; therefore it is for you to determine under the evidence in the case what was the value of the two acres taken; also, what damage was done, if any, to the acre that was left.] [2]    That depends entirely upon the evidence in the case.    It will not do for a jury to put a fanciful estimate on the property.    They must be guided by the evidence in the case, and the weight of the evidence.    In determining what the weight of the evidence is, you take into consideration not only the number of witnesses testifying upon one side or the other, but you must also take the character, the knowledge, the experience of the witnesses.    In every man naturally there is some difference as to the weight of his testimony, depending very much upon his knowledge of the facts in the case, the experience he may have had, his age, and his opportunities for observation.    All these are matters to be taken into consideration by the jury in determining the weight of the testimony.    The jury is to determine what was the value of this land at the time it was taken by this railroad company, which was in July, 1885. What were these two acres worth at that time or what injury was done by the railroad? . . . . .

You will notice in this case there is a very remarkable diversity of opinion in the testimony of the different witnesses who have been examined on the part of the plaintiff and on the part of the defendant.    The opinions of these witnesses vary from, I think about $2,500 as the lowest estimate that is put upon the property by any one of the witnesses, as to the value of these three acres of land, up to about $12,000, as I understand the testimony of Joseph Picton, who swears that the property was worth from $3,000 to $4,000 an acre, three acres making $12,000.    It is the duty of the jury to examine this evidence, estimate its

weight, and from all the evidence in the case, from the weight and character of the evidence, endeavor to come to a fair estimate of the value of this property, also to estimate the amount of depreciation or injury done to the property that was not taken.

In estimating the value of this property, of course the jury should take into consideration what the nature of the property is, what it is reasonably adapted for. For instance, you have three acres of land. If it were out in the country and had no other value except as farm land, the natural value you would put upon it then, would be that of farm land. If it were so situated that it could be turned into town lots, then the natural estimate of damages would be its capability of being made into town lots; or, if it were eligible for manufacturing purposes, then its value for a place of business of that character. Of course, property in a town or on the outskirts of a town, as a general rule, would be estimated at a higher rate than if it were to be estimated merely as farm land, and the jury must determine, from the evidence in the case, what that value is. [If you find under the evidence in the case, that this property was adapted, for instance, for town lots, then ordinarily it would have a higher range of value than if it were simply used for agricultural purposes. You have heard quite a considerable amount of testimony with regard to the value of lots, how many lots it would make if it were cut up, how it could be divided and what the value of those lots would be. It would scarcely be a fair estimate of the value of the property to take this property and divide it all up into town lots, and say that each town lot is worth so much money, and that therefore, the whole property is worth that amount of money; because that presupposes that the moment that that property is cut into town lots, it could all be sold off at that figure. That is a question for you whether that would be the case, particularly with a piece of ground on the outskirts of a town, where perhaps the evidence would not show that the tide of improvement was going. It is a question of fact for a jury. For instance, if a piece of ground of three acres were to be cut up into town lots, I do not know how many town lots it might be cut into, whether 50 or 100, the question would be how many a party would be likely to sell in one year, how long he would have to wait in order to

Charge of Court below.

sell the balance, and the amount of taxes he would have to pay whilst he was holding the other town lots. Therefore, I say the estimate of the value of property based upon its value as town lots, would be ordinarily not reliable unless you also take into consideration, in estimating the value, that those town lots might remain on hand for many years without being sold. It is a question of fact for you to determine. Whilst its eligibility or capability of being made into town lots is something for you to take into consideration, in determining its value, yet it would not be a reliable estimate of its value for you to take the value of each town lot, if it were cut up into town lots, and fix that as the value, unless the evidence in the case showed that the moment it was cut up into town lots it could all be sold at once.] [5]

The same remark might apply with regard to the capability or eligibility of this property for manufacturing purposes. It never had been used for manufacturing purposes. It was a meadow, most of it, a portion of it situated on the slope of a hill, and the other portion on a level, somewhat swampy down near the railroad, according to the testimony in the case. Take the testimony as to the value of the property, and perhaps the most of the testimony of the witnesses upon this subject bears, in the first place, upon the value as a whole. We have not much evidence here as to the value distinctly of the property simply that was taken by the railroad company. The great bulk of the testimony is as to the value of the three acres as a whole, and also as to the value of that portion which was left. Therefore, I presume, under the testimony in this case, it would probably be the simpler and easier method for you, in the first place to determine the value of this property as a whole three acres, and then to determine what is the value of the property that still remains, that was not taken, deducting one from the other to ascertain the amount that the plaintiff would be entitled to with interest.

\*    · \*    \*    \*    \*    \*    \*    \*

The defendant's points are as follows:

1. The true measure of damages in such a case as this is the difference in the market value of the property immediately before the railroad was located upon the premises, and the market value thereof after the railroad of defendant was built upon the same.

Answer: That point we affirm.

2. That the plaintiff has shown no such title to the premises in question as to entitle him to damages, and the verdict must be for the defendant.

Answer: That point we decline to affirm.[3]

The jury returned a verdict in favor of the plaintiff for $6,669. Judgment having been entered on the verdict, the defendant took this writ, assigning for error:

1. The admission of plaintiff's offer.[1]

2. The part of the general charge in [ ][2]

3. The answer to defendant's point.[3]

4. The admission of plaintiff's offer.[4]

5. The part of the general charge in [ ][5]

6–8. The admission of plaintiff's offers.[6 to 8]

*Mr. Guy E. Farquhar*, for the plaintiff in error:

1. To maintain trespass there must be either an actual possession or an immediate right of possession flowing from the right of property, and the plaintiff must have been deprived of it by the tortious act of another: Morrison v. Wurtz, 7 W. 437; Waldron v. Houpt, 52 Pa. 408; Rifener v. Bowman, 53 Pa. 313; Greber v. Kleckner, 2 Pa. 289. And in proceedings to assess damages for land taken or injured by a railroad company in the construction of its works, it is incumbent on the plaintiff to show title to the property appropriated or injured: Penn. S. V. R. Co. v. Keller, 20 W. N. 125; s. c. 9 Cent. R. 741.

2. A purchaser at sheriff's sale before the deed has been acknowledged has an inceptive interest in the land which may be bound by a judgment, and for the purposes of lien when the title is perfected by the acknowledgment of the deed, the title dates back to the date of the sale; but the purchaser before acknowledgment of the deed has neither constructive possession nor right to possession, and until the acknowledgment of the deed the debtor is entitled to the possession with all its attendant advantages: Garrett v. Dewart, 43 Pa. 342; Hawk v. Stouch, 5 S. & R. 157; Slater's App., 28 Pa. 169; Bellas v. McCarty, 10 W. 23; Thomas v. Connell, 5 Pa. 13.

3. At the time the injury was done, the proceedings insti-

tuted, and up to the time of the acknowledging of the sheriff's deed, the legal title to and the possession of the premises were in the heirs of James Cleary, deceased. The proceedings should have been in their name, and upon a recovery the railroad company would have been protected from any further liability, and the rights of the heirs and of the sheriff's vendee to the money awarded could have thereafter been determined by the court. Moreover, the mode of assessing the damages permitted by the court was purely speculative and therefore improper: Searle v. Railroad Co., 33 Pa. 63; Reading & P. R. Co. v. Balthaser, 119 Pa. 472.

*Mr. J. W. Moyer* and *Mr. James Ryon* (with them *Mr. John A. Nash*), for the defendant in error:

1. The court very properly ruled that plaintiff's title related back to the date of the sheriff's deed: Hardenburg v. Beecher, 104 Pa. 23; Morrison v. Wurtz, 7 W. 437; Robb v. Mann, 11 Pa. 300; Hawk v. Stouch, 5 S. & R. 161; Stephens' App., 8 W. & S. 188; Slater's App., 28 Pa. 170; Hoyt v. Koons, 19 Pa. 277; Garrett v. Dewart, 43 Pa. 342. Whether the plaintiff holds the title in trust for the other heirs or not, the defendant cannot raise the question in this case: Penn. R. Co. v. Duncan, 111 Pa. 352; Boyd v. Negley, 40 Pa. 377; Conshohocken Ave., 1 Walk. 429.

2. The instructions of the court were simply explanatory of the method by which the jury might arrive at the value of the property as a whole, unaffected by the railroad, and the same as affected by it, which is the true measure: Watson v. Railroad Co., 37 Pa. 469; Hornstein v. Railroad Co., 51 Pa. 87; Shenango etc. R. Co. v. Braham, 79 Pa. 447; Pittsb. etc. R. Co. v. Patterson, 107 Pa. 461; P. V. & C. Ry. Co. v. Vance, 115 Pa. 331.

OPINION, MR. JUSTICE WILLIAMS:

The court below was right in the admission of the evidence which is the subject of the first assignment of error. The lot of land over which the line of the road belonging to the plaintiff in error had been laid, belonged prior to 1882 to James Cleary. He died in that year, and his title descended to his heirs-at-law of whom M. J. Cleary is one, and letters of admin-

istration upon his estate were regularly issued to M. J. Cleary. A judgment had been recovered against James Cleary in his lifetime by A. E. Beck in the Common Pleas of Schuylkill county. After the death of James Cleary it was regularly revived against the administrator, and on the 11th of July, 1885, the lot in controversy was brought to sale by the sheriff, and sold to M. J. Cleary. On the 31st of July, 1885, the railroad company entered and located their line of railroad. This proceeding for the assessment of damages was begun by M. J. Cleary in May, 1887. The acknowledgment and delivery of the sheriff's deed did not take place until April, 1888. It is well settled however that a purchaser at sheriff's sale acquires an inchoate title in the land purchased by virtue of his bid, and its acceptance by the sheriff. The subsequent acknowledgment and delivery of the deed provides the purchaser with the evidence of his title which relates to, and takes effect as of the date of the sale recited in it. The title of M. J. Cleary to this land vested at the time of his purchase from the sheriff on the 11th of July, 1885, notwithstanding the fact that he was not provided with the legal evidence of his title until 1888. As his purchase was prior to the entry by the railroad company, this proceeding to assess damages against the company was properly begun in his name. After the damages have been fixed, and the money paid into court, it may be the question of the character of the plaintiff's holding will be raised, and the court called upon to decide whether he holds the title as owner, or as trustee for the heirs-at-law of James Cleary, but that question is unimportant now. The title being in him, the damages are properly assessed at his instance. The first, second and third assignments of error are therefore dismissed.

The fourth and fifth assignments raise a more serious question. The true measure of the damages sustained by any given lot of land is found in the difference between its selling value before and after the entry complained of: Read. etc. R. Co. v. Balthasar, 119 Pa. 483. It is proper to consider for what purpose it may be used to advantage, in order to determine for what price it will sell. It may be salable as a site for the erection of a hotel, a factory, a dwelling, or a wharf, but it is not proper to lay before the jury proof of what the hotel or other structure would cost, together with proof of the value of the lot with

such structure upon it, and treat the difference between these sums as the value of the lot. Such a method would be speculative and fanciful. Equally improper is evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. It is proper to inquire what the tract is worth, having in view the purposes for which it is best adapted, but it is the tract, and not the lots into which it might be divided, that is to be valued. The learned judge intended to guard this point in his charge to the jury, yet he seems to have left a question to the jury with which they had nothing to do. He said: "It would scarcely be a fair estimate of the value of the property to take this property and divide it all up into town lots and say that each town lot is worth so much money and that therefore the whole property is worth that amount of money; because that presupposes that the moment that property is cut into town lots it could all be sold off at that figure. That is a question for you whether that would be the case, particularly with a piece of ground on the outskirts of a town where perhaps the evidence would not show that the tide of improvement was going. It is a question of fact for the jury."

We do not agree with the learned judge that there was any such question for the jury in this case. The jury are to value the tract of land, and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor in deciding what price he could afford to pay, would consider the chances and probabilities of the situation as then actually existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a re-sale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in. This is a rule that is well settled and the court should have drawn the attention of the jury to it so as to have left no room for uncertainty on their part. They should have been told that they had nothing to do with the subdivision of this tract, the price of the lots or the probability of their sale; but that they were to ascertain the fair selling value of the land before and after the entry by the railroad company, in order to determine the actual damage done to its owner.

The court was also in error in admitting the evidence offered to show why James Cleary had declined to sell or lease the land or the fact that he had done so. James Cleary might have had a reluctance to part with it for many reasons; he might have had a wise, or an unwise, confidence in its value as an investment, or a desire to see it occupied for some particular purpose, but his views upon this subject were not relevant to the inquiry before the jury. The questions before them were first, what was this land worth before it was touched by the railroad? Next, what was it worth as affected by the location of the road? When these questions were settled the damages were ascertained.

> Judgment reversed, and venire facias de novo awarded.