[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By an appeal dated February 16, 1988, the plaintiffs are appealing from an Assessment of Damages dated January 8, 1988, filed by the defendant, pursuant to the provisions of Conn. Gen. Stat. sec.13a-73 (b)(e). In that Assessment of Damages, the defendant determined that $25,500 is the compensation that should be paid to the plaintiffs for interests that the defendant acquired by condemnation in portions of the plaintiffs' land in Coventry. In their appeal, the plaintiffs allege that compensation of $25,500 is inadequate. The appeal has been referred to me, as a state trial referee, for a hearing and judgment
In the course of the hearing, the court heard testimony and received a report from the appraiser for the plaintiffs; heard testimony and received a report and an updating-letter from the appraiser for the defendant; and heard testimony from other witnesses, including a town official of Coventry, engineers, and a Department of Transportation CT Page 9679 planner. The court also had the benefit of viewing the premises and their vicinity and of the briefs submitted by the parties. In their briefs, the parties raised the issue of the applicable rate of interest if interest is awarded, and the court scheduled and held a hearing limited to evidence on that issue. At that hearing, the court heard an expert witness and admitted some additional exhibits.
The plaintiffs' land in which the interests were condemned is a portion of a 10.7 acre tract on the southeasterly side of Woodbridge Road. The interests taken by condemnation in that tract are the following: (1) a fee simple interest in one portion, hereinafter designated as Portion F, consisting of 2.4 acres; (2) a perpetual easement to slope for the support of a proposed highway, hereinafter referred to as Relocated Woodbridge Road, to replace Woodbridge Road; a perpetual easement to excavate a ditch, place riprap, and remove, use or retain excavated material; the slope-easement and excavation-easement cover an area of 0.53 of an acre; (4) a perpetual drainage easement, covering an area of 0.02 of an acre; (5) another perpetual easement to drain from a proposed 24-inch pipe located on abutting land; (6) the temporary right to construct a proposed driveway; (7) the temporary right to install a proposed erosion control lining. The temporary rights cover an area of 0.04 of an acre and terminate on completion of the work by the state. All of the easements and rights are interests in that portion of the plaintiffs' land remaining after Portion F was taken. That remaining portion, which is wooded, raw land, gradually rises from street grade to the rear of the property, and is seasonally wet in some parts; it is hereinafter designated as Portion R. The combined easement interests and the temporary rights cover an area of 0.59 of an acre.
A single-family residence is located at the westerly end of Portion R. Zoning regulations for this residence require a lot with 150 feet of frontage and 40,000 square feet in area. In recognition of the requirements of the regulations, both appraisers allocated 150 feet of frontage on Woodbridge Road and about one acre of Portion R for a lot for the residence. The court concurs in that allocation. After the allocation, Portion R consists of 7.3 [plus or minus] acres. If Relocated Woodbridge Road is constructed, Portion R will have 847 feet of frontage on Relocated Woodbridge Road, of which 150 feet are allocated to the present single-family residence, leaving 697 feet of frontage on Relocated Woodbridge Road.
Portion F abuts Woodbridge Road for about 735 feet. The taking of Portion F and the easement-interests and temporary rights in Portion R are part of a project for the relocation of Route 6 in the Woodbridge Road area. This project requires an application for a permit that may be obtained on the basis of an Environmental Impact Study (EIS) filed with the Army Corps of Engineers. The EIS was submitted in 1987, and a public hearing was held in March, 1988. On August 4, 1989, the Army Corps denied the application for a permit on the ground, inter alia, that "at least one far less environmentally damaging practicable alternative exists. . ." CT Page 9680 Lacking the permit, the defendant is not proceeding with the proposed relocation of Woodbridge Road; a new EIS must be filed; and the future course of the project depends on what changes have to be made to the proposed route to obtain the required permit. In the meantime, the defendant still has title to Portion F, the easement-interests and the rights, and Relocated Woodbridge Road has not been constructed.
These facts raise the question whether, in determining what is just compensation, the court should determine that just compensation as of the date of the taking or as of some later date. The court is of the opinion, and finds that just compensation should be determined as of the date of the taking. The court's opinion is based on two considerations: (1) Because the future course of of the project has not been definitively settled, any estimate now of the damages, if any, sustained by the plaintiffs after the date of the taking would be speculative, and might well result in compensation to the plaintiffs that would be more or less than they are entitled to. 2) On the other hand, if the plaintiffs sustain damages that are the proximate result of the taking but arise after the date of the taking, and, because those damages were not known or reasonably foreseeable at the date of the taking, those after-taking damages are not included in determining the difference between the before-taking value of the plaintiffs' land and its after-taking value and, thus, are not included in the damages for which compensation is awarded, the plaintiffs would be entitled, under Article I Section 11 of the Connecticut Constitution, to an award for those after-taking damages in addition to the just compensation determined as of the date of the taking. Under that constitutional provision, the state has a duty to pay just compensation for damages proximately resulting from the taking.
 II
On the issue of just compensation, in their brief the plaintiffs claim, as testified to by both their appraiser and a witness, that "a five (5) lot subdivision was very probable." The defendant, on the other hand, claims that the tract must be viewed as vacant land and that its before-taking valuation cannot be based on a hypothetical subdivision. In support of his claim, the defendant cites Minicucci v. Commissioner of Transportation, 211 Conn. 382, 559 A.2d 216 (1989). In that case, the court says (at p. 385): "`Courts have uniformly adopted the approach that raw land as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision. . . .The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision development.'" (Emphasis added in Supreme Court opinion). The extent to which that rule has been "uniformly adopted" is shown in the "Endnotes" to the opinion in Estate of Walter Langer v. Town of Westport (CV 88 009 39 06, Judicial District of Stamford/Norwalk, December 14, 1990) reported in Connecticut Real Estate Law Journal, Volume 9, Number 2, page 28. Those "Endnotes," CT Page 9681 which are appended to this opinion, list cases in 19 jurisdictions that observe the "uniform rule."
On page 23 of the opinion in Langer, the referees (retired Judges Saden, Belinkie and Herman) note: "The speculation and conjecture that results from valuing raw land as if in fact it was a subdivision can inevitably lead to inflated valuations created by mathematical formulae that do not measure the realities of the problems presented to a developer buying raw land as a whole by attempting to prognosticate costs and lot prices four and five years or more in advance." Some of the "costs" noted in the cases in the "Endnotes" are the expenses of grading and other improvements necessary to make the lots saleable, taxes, advertising, and brokers' commissions. A substantial part of the price of the subdivided lot may merely represent the developer's recapture of those substantial costs. Further, as in Minicucci at p. 386, there was "no evidence that a subdivision application was ever filed or a plan even prepared." Still further, although a percolation test is a condition precedent to obtaining a building permit in Coventry, the plaintiffs have not had that test performed. On the basis of the evidence presented and the court's examination of the premises, the court is of the opinion, and finds, "that it was not reasonably probable that the land would in fact be subdivided in the reasonably near future." Ibid. (As the opinion in Langer notes parenthetically at page 15, the phrase "subdivided in the reasonably near future "clearly "would have reference to the period of time prior to condemnation.") (emphasis in opinion).
 III
"`The owner of land taken by condemnation is entitled to be paid just compensation. Conn. Const. art. I sec. 11. If the taking is partial, the usual measure of damages is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it thereafter.' Lynch v. West Hartford,167 Conn. 67, 73, 355 A.2d 42 (1974)." Minicucci at p. 384.
The appraiser for the plaintiffs states in his report (dated April 10, 1991, Exhibit I, p. 10), "An investigation of sales within the town of Coventry revealed extremely limited data." He lists two comparable sales, both in 1986: "Sale 1 w/s Wrights Mill Road. . .26 acres. . . Unit Value $9,615/acre." "Sale 2 e/s Pucker Street. .9.64 acres. . .Unit Price $4,461/acre." He found the "highest and best use"for the 9.7 acres to be "development with residential building lots." (Exhibit I, p. 7). It is his opinion that the before-taking value of the 9.7 acres is $20,000 per acre, or $194,000. (Exhibit I, p. 15). It appears to the court that the $20,000-per-acre appraisal is not based upon his estimate of the fair market value of the 9.7 acres in accordance with the rule in Minicucci, but, rather, upon his estimate of their fair market value subdivided into "residential building lots." The court, accordingly, does not concur in his $20,000-per-acre opinion. The court also does not concur in his additional opinion that the taking reduces the value of the residence and CT Page 9682 the one acre allocated to it. The court concurs, instead, in the opinion of the appraiser for the defendant that the taking will not adversely affect the value of the residence and the one acre allocated to it.
The original report of the appraiser for the defendant was made as of November 24, 1986. In that report, he found the before-taking value of the 9.7 acres to be $44,000 and the after-taking value of the 7.3 acres remaining to be $18,450, making total damages of (rounded) $25,500. The report lists three comparable sales in Coventry, two in 1985, and one in 1986, which is different from that listed by the appraiser for the plaintiffs. This 1986 comparable was for a sale of 8.95 acres at a sale price of $3,631 per acre, which the appraiser for the defendant adjusted upward to $5,600 per acre to compensate for the greater frontage of the 9.7 acres.
In an updated report, dated July 12, 1988, the appraiser for the defendant notes, "Several comparable sales have occurred since the original appraisal. Three of these sales considered the most comparable to the subject acreage were analyzed. The sales dated December 31, 1986 to October 29, 1987 range in size from 13 [plus or minus] to 27 (plus or minus) acres and sold from $5,405 to $7,692 per acre." He then states that "considering these sales," he estimates the before-taking value of 9.78 acres to be $8,500 per acre or $83,130, which he rounds to $85,000. The court concurs in the "rounded" total valuation of the appraiser for the defendant regarding the before-taking value of the 9.78 acres and finds that the before-taking value of those 9.78 acres is $85,000. In the updated report, the appraiser for the defendant also estimates the value of the 7.38 acres remaining after the taking to be $6,800 per acre or $50,184, which he rounds to $50,000. After the taking, 0.55 acres of the remaining 7.38 acres are encumbered by four perpetual easements. The court is of the opinion, and finds, that, encumbered by those easements, the remaining 7.38 acres are further reduced in value by 7.5% of $6,800, or, rounded, $500, and that the per-acre value of the 7.38 acres remaining after the taking is $6,300 per acre or $46,494, which the court rounds to $46,500.
Accordingly, the court finds that the after-taking value of the remaining 7.38 acres is $46,500; that the value of the plaintiffs' remaining after-taking land is $38,500 less than the before-taking value of the plaintiffs' land; and that the plaintiffs have sustained damages in the amount of $38,500 as a result of the taking. In finding the loss in value of $38,500, the court has considered, inter alia, the taking of the 2.4 acres; the taking of the easements, and the temporary rights; and the assumptions a reasonably prudent, informed, and willing seller and buyer would make in negotiating a fair price for the land. Those assumptions would include, inter alia, the effect of the taking and the proposed construction on the following: the costs (referred to previously) necessary to make the land marketable as sites for residences; the length of time that would elapse before the work necessary to have the sites marketable would be completed; and the probable date when CT Page 9683 Woodbridge Road would be relocated. The court finds that a reasonably prudent, informed and willing seller and buyer would assume in their negotiations that Woodbridge Road would be relocated substantially in the manner shown on the taking map. That the defendant had acquired the land necessary to extend the Relocated Woodbridge Road through to Skinner Road would reinforce that assumption. The court has not included in its finding of just compensation any compensation for any damages sustained by the plaintiffs arising after the taking and proximately caused by the taking, including, without limiting the generality of the foregoing, any damages proximately caused by the taking and arising after the denial of the permit.
 IV
"In condemnation cases, even in the absence of a provision for interest in the statute, the constitution requires just compensation, and its ascertainment is a judicial function." Leverty Hurley Co. v. Commissioner of Transportation, 192 Conn. 377, 380, 471 A.2d 958 (1984). See E. F. Construction Co. v. Ives, 156 Conn. 416, 420, 242 A.2d 768 (1968) (Interest to date of payment is a proper element of damages for the taking.) As noted previously, the parties raised the issue of the applicable rate of interest, and the court held a hearing on that issue. In arriving at the applicable rate, the court was guided by three principles: (1) The applicable rate is to be decided with reference to the rate on debt obligations only. The interest rate on shares of common stock or other equity securities is not to be considered. "No case has suggested that the Constitution contemplates a "prudent investor" in stocks or other equity securities." Redevelopment Ag. of C. of Burbank v. Gilmore,38 Cal.3d 790, 806 (fn. 17), 700 P.2d 794 (1985), hereinafter cited as Redevelopment. (2) The applicable maturity of the obligation is to be within the period from the taking-date to the date of the Memorandum of Decision. "In general, the trial court should examine. . .the rates prevailing during the period a condemnation payment was delayed for. . .obligations. . .whose terms or maturities fall within the period of delay." Redevelopment at p. 806. (3) The applicable rate of interest is that sought by a reasonably prudent investor on the date of taking.
Introduced into evidence at the hearing were rates on the date of taking for the following: the prime rate; the rate for prime commercial paper with 6-month maturity; AAA corporate bonds; 3-year Treasury securities; 10-year Treasury securities; high-grade municipal bonds; and the rate charged by the Internal Revenue Service on underpayments and paid on overpayments. From a consideration of these rates, the court finds that the prevailing, and applicable, interest rate that could be realized by a reasonably prudent investor on debt obligations with safety of principal, for the period from January 8, 1988 to the date hereof is 8.13%.
V CT Page 9684
In his brief, the defendant claims that the plaintiffs are not entitled to interest on any excess because of the "pattern of delay after delay." Although almost four years have elapsed from the date of taking, the file does not substantiate the defendant's claim. The pleadings were not closed (by the defendant's withdrawal of three special defenses) until August 18, 1988. The order for the appointment of a referee was entered on November 15, 1988, on the defendant's motion. The case was assigned for a hearing on February 8, 1989, before former Chief Justice House. On January 4, 1989, the attorney for the plaintiffs requested, by letter, that the case be continued until "the spring or fall" because "the appraisal. . .has not yet been completed." Between January 4, 1989 and July, 12, 1990, the file shows no documents filed by either the attorney for the plaintiffs or the attorney for the defendant.
On July 12, 1990, the attorney for the plaintiffs wrote to "Chief Clerk" at the Superior Court in Hartford as follows: "The above-named case was referred to Justice House. I wrote to him and asked that he assign this matter for trial. I received a call from his secretary who advised that Justice House is inactive and that I should request that the matter be reassigned. Please have this matter assigned to another referee." On July 16, 1990, Judge House's secretary wrote to the Clerk's Office at Rockville: "No referee is presently assigned to the case. J. House wants the reference to him revoked." (underlining in original). On November 5, 1990, the attorney for the plaintiffs filed a motion that the appeal be referred to a "new State Trial Referee." An order was entered on January 23, 1991 (by error, dated January 23, 1990) that the motion "is hereby granted." There was, however, no reference in the order to any referee by name; a reference to a referee by name was not made until the order of August 1, 1991, referring the case to me. Although the defendant made motions to dismiss designed to force the plaintiffs to complete a court-ordered exchange of reports, it seems to the court that the longest single span of inactivity (January 4, 1989 to July 12, 1990) is one that both parties must share the blame for. Further, some of the delay may be explained by the need to revoke the reference to former Chief Justice House, by the appearance of new counsel for the defendant, and by the incomplete order of reference on January 23, 1991. The court does not find proved the claim that the plaintiffs unreasonably delayed the trial of this appeal.
 VI
Because the amount of damages awarded by the court exceeds the amount of damages assessed by the defendant, the plaintiffs are entitled under Conn. Gen. Stat. sec. 13a-76 to an award of reasonable "appraisal fees." The plaintiffs' appraiser sought a fee of $3,500 for his services plus an additional $1,000 for the services of an engineer used by the appraiser as an incident to his appraisal. Section 13a-76 does not authorize the court to make an award of fees for engineering services. Sorenson Transportation Co. v. State, 3 Conn. App. 329, 333, 488 A.2d 458
(1984). Furthermore, the engineer appeared as an expert witness for the CT Page 9685 plaintiffs; he testified concerning tests on the plaintiffs' land, fill requirements, construction costs of a drainage pipe, and probable actions of the Coventry zoning authorities. From this, the court infers that whatever services were rendered to the appraiser were not services reasonably necessary as services additional to the services performed for the plaintiffs.
The defendant also claims that the appraiser's fee of $3,500 is unreasonable. The appraisal report includes an appraisal of the residence in addition to before-and-after appraisals of the plaintiff's land. The report also includes alternative appraisals, one assuming the project is not completed and the other assuming the project is constructed as proposed. The court's review of the report persuades the court that the fee sought is not unreasonable and the court awards appraisal fees of $3,500.
 VII
In sum, the court finds that the plaintiffs have sustained damages of $38,500 as a result of the defendant's taking 2.4 acres of the plaintiffs' land and the hereinbefore-enumerated easements and temporary rights. The court finds that the after-taking fair market value of the plaintiffs' land is $46,500 (exclusive of the residence and the lot allocated to it) and that the before-taking fair market value of the plaintiffs' land (exclusive of the residence and the lot allocated to it) was $85,000, and that, therefore, the after-taking fair market value of the plaintiffs' land (exclusive of the residence and the lot allocated to it) is $38,500 less than the before-taking fair market value of the plaintiffs' land (exclusive of the residence and the lot allocated to it). Judgment may enter, therefore, for the plaintiffs to recover from the defendant damages in the amount of $38,500, less, however, the amount of $25,500 already paid, leaving an excess of $13,000 for which judgment may enter, plus interest at the rate of 8.13%, which the court finds is fair, just, and reasonable, from the date of taking to the date of payment of the judgment debt, and plus reasonable appraisal fees of $3,500, and costs.
Jay E. Rubinow State Trial Referee
Endnotes Connecticut Real Estate Law Journal, Volume 9, Number 2
1. The following citations contain, in some instances, quotations from the particular cases; in other instances, only a brief comment to avoid excessive repetition.
(a) Dept. of Highways v. Schulhoff,455 P.2d 402, 404 (Colo. 1968): CT Page 9686
 Appraisers cannot arrive at their opinions of fair market value by hypothetically carving it up into residential building sites, estimating the value of each site, and then adding them all together. (Cites NICHOLS on p. 405. Cites decisions in Minnesota, New York, North Carolina, Oregon.)
(b) State v. Malecker, 120 N.W.2d 36
37-39 (Minn. 1963);
 Owner on direct exam testified that the value of whole tract (110 acres) taken by the state was depreciated by $100,000 by the taking, a figure reached by adding the minimum to each individual lot (there being 131). This testimony was stricken when the court pointed out it was the value of the individual lots. The 110 acres were unimproved real estate that had been subdivided into lots by a plat tentatively approved by the town but not filed with the register of deeds and not yet accepted by county authorities.
 None of the lots had been sold. The court pointed out it was interested in the wholesale value of the property, viz., selling the entire property as "one big unit rather than selling the individual lots separately." Thereupon owner recomputed his minimum and reduced his estimate to $68,000. The amount of damages awarded by the commissioners appointed by the court was $20,000. The jury brought in $7,450 which, by additur, was raised to $9,000. Both state and owner appealed respectively, the state claiming damages were $6,500 and the owner claiming $145,000. CT Page 9687
 In somewhat analogous situations, where acreage without a subdivision is condemned, the courts have uniformly refused to permit an owner to estimate damages on the basis of lots and blocks platted for purposes of the trial. The Texas court applying this rule in Lower Nueces River Water Supply Dist. v. Collins, (Tex.Civ.App. ) 357 S.W.2d 449, 452, stated:
 [T]he normal reaction of the jury was to see how much profit the owners could make, over and above expenses, by selling the lots at retail (emphasis added).
 Pennsylvania has dealt with the problem in a long line of cases beginning with Pennsylvania Schuylkill Valley R.R. Co. v. Cleary, 125 Pa. 442, 17 A. 468. The court there stated that the jury was not to inquire into what a speculator might be able to realize out of a resale in the future, but was to decide what a purchaser would now be willing to pay for the property in its present condition. In a later case, where the property had been actually subdivided at the time of taking, the court held it was not error to exclude the plat from evidence. In Pennsylvania neither an unrecorded plat nor a plat from which no sales have been made is admissible in evidence. The court found it was not error to exclude evidence of the aggregate damage to individual lots in Rothenberger v. Reading City, 296 Pa. 423, 246 A. 104. In a situation quite similar to the instant case, the Pennsylvania court summarized and applied the rules which were suggested in the earlier cases, in Rothman v. Commonweath, 406 Pa. 376, 178 A.2d 605, where 156 acres of farmland were CT Page 9688 platted into lots "[i]n keeping with the modern residential paradise." It was held not to be error to charge the jury that they could not consider and multiply the value of individual lots in arriving at their verdict.
 California has followed the same rule. City of Los Angeles v. Hughes, 202 Cal. 731, 262 P. 737, People v. Johnson, Cal.App., 22 Cal.Rptr. 149.
 The rationale for rejecting appellant's contention is well expressed in State v. Tedesco, 4 Utah 2d 248, 250, 291 P.2d 1028, 1029, where the court stated:
 A reading of the testimony of defendants' experts can lead to no other reasonable conclusion than that they arrived at their determination of Parcel 1's value by taking the sale prices of comparable lots in the vicinity assigning such values to the individual lots involved in this litigation and adding them up without considering any cost or expense incident to the sale of each of the lots or the time within which the lots might have been sold. In other words they assumed that there was a willing seller of 62 lots who had 62 present willing buyers, without nothing left to do but deliver an ownership document, without considering a windfall that would result in favor of the sellers when this condemnation relieved them of paying commissions for the sale of the lots, the completing of streets, paying abstract costs taxes which daily increase because of customary proration advertising costs, management and supervision expense and last, but not least, by assuring them a fair profit, all of which no doubt were CT Page 9689 included in the sales prices of the comparable lots in the vicinity which the experts considered in making their appraisals. Parenthetically, we suggest that no one seriously would contend a tract sold to one person would produce as much as would 62 separate sales to individual homeseekers.
 We are in accord with the view of the Utah court.
 In the instant case the trial court charged the jury that the measure of damages was the difference in the market value of the entire tract before and after the taking. The court admonished the jury to consider only a single buyer in arriving at market value, stating that market value "does not mean what the individual lots would sell for to numerous individual buyers." We think that the court's ruling and charge were correct and that to hold otherwise would open the door to unlimited vagaries, speculation, and conjecture, of a kind we have consistently condemned. Market value is not to be determined by a myriad of separate transactions for the purchase of individual lots over a long period of time. What we are concerned with is the price which an individual purchaser would pay for the entire tract in a single transaction, without concerning the jury with all of the uncertain costs of advertising, brokers' commissions, taxes, utilities, grading, and improvements which a protracted lot-by-lot sales campaign would inevitably require.
(c) Yoder v. Sarasota County, 81 So.2d 219,221 (Fla. 1955):
We have consistently ruled that CT Page 9690 the amount of compensation to be awarded. . .in an eminent domain proceeding is the value of the land taken at the time of the lawful appropriation. It is appropriate to show the uses to which the property was or might reasonably be applied. . . . It is not proper to speculate on what could be done to the land or solicit evidence on what it might be worth with such speculative improvements at some unannounced future date. To permit such evidence would open a floodgate of speculation and conjecture that would convert an eminent domain proceeding into a guessing contest.
(d) State v. Williamsville Stone Co.,622 S.W.2d 407, 409 (Mo.App. 1981):
 Raw land with little or no improvements or preparation for subdivision may not be valued as if the land were a subdivision; thus the "lot method" approach to valuation may not be used. If the appraisers computed the present value solely by determining the number of lots and multiplied that number by the lot's contemplated selling price in the future, it would be erroneous even if the development expenses and other selling expenses were deducted. . . . The accepted rule for the valuation of unimproved land is to consider the land in its present condition as a whole with consideration given to enhancement in value due to the property's adaptability to subdivision development.
(e) Commonwealth v. Evans,361 S.W.2d 766, 770 (Ky. 1962):
 A map or plat may be admitted for the purposes of showing the susceptibility of the tract of land to CT Page 9691 platting and its adaptability to residential purposes. . . .The measure of compensation is not, however, the aggregate of the prices of lots into which the tract could be best divided, since the expense of cleaning off and improving the land, layout out streets, dividing it into lots, advertising and selling the same, and holding it and paying taxes and interest until all lots are disposed of cannot be ignored and is too uncertain and conjectural to be computed. 4 NICHOLS ON EMINENT DOMAIN 123142(1).
 At p. 771: The price for which individual lots will sell at retail involve various elements of effort, enterprise and expense. A tract of land that has not been subdivided or made physically ready for sale in lots must be valued at wholesale.
(f) Commonwealth v. Ball,420 S.W.2d 683, 684 (Ky.App. 1967):
 [I]t developed that one of the witnesses had made a speculative division of the frontage into 29 building lots 100 x 200 feet, and after placing a value (up to $2,000) on each lot, had added his lot figures in reaching his before value estate. Another witness had used a similar method, and after totaling the projected value of the lots, had subtracted this figure from his before value figure and thereby reached his after value appraisal. Valuation evidence of this kind was condemned in Commonwealth v. Evans, supra, because it does not fairly represent the market value of the unimproved tract as a whole. CT Page 9692
(g) Etowah County v. Clubview Heights Co., 102 So.2d 9 (Ala. 1958) (quoting 5 NICHOLS ON EMINENT DOMAIN 18.11(2) p. 114):
 As bearing upon [market value] the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, but he cannot go further and describe in detail to the jury a speculative enterprise for which in his opinion or that of some expert the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise.
 The latest edition of NICHOLS contains essentially the same language (5 NICHOLS ON EMINENT DOMAIN 18.11(2), PP. 18-74) adding:
 In other words, he cannot capitalize the projected earnings of a nonexistent enterprise or projected use. The owner cannot, for example, introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold and the price that each would bring, and the details of a possible improvement of the land, and its value, or the expected profits. . . after such improvement was completed are equally inadmissible for the same reason.
(h) Arkansas State Highway Comm'n v. Allen, 484 S.W.2d 331 (Ark. 1972):
 Reversible error to base fair market value of 11.74 acre tract in condemnation on testimony of CT Page 9693 landowner and his expert instead of on the open market of the entire tract on the date of taking. They based their opinions on the aggregate of their estimated number and value of building plots into which acreage could be divided and eventually sold. "This procedure was thoroughly condemned in Arkansas State Hwy. Comm'n v. Watkins, 313 S.W.2d 86," (citing NICHOLS, supra).
(i) In Re Armory Site in Kansas City,282 S.W.2d 464, 472-473 (Mo. 1955):
 The measure of just compensation. . . is not the value of the land at some future date after it has been improved at considerable cost to make it usable for a purpose for which [owner] claims it to be reasonable adaptable. (Citing 4 NICHOLS EMINENT DOMAIN (3rd ed.) 12.3142) It is the present value for the adaptable use that should be determine. . . . It was not proper for this witness, under the guise of explaining how he arrived at his expert opinion, to add to his estimated value of $70,000 for the land on the map to be broken down into streets and lots, to his estimate of $90,000 necessary for improvements, and then by dividing the number of proposed lots show that each of the 145 lots would have what he called an "improved cost" of $1,100. In effect, this witness attempted to convey. . . that the present value of the land included the cost of developing it.
 Accord Minyard v. Texas Power 
Light Co., 261 S.W.2d 957, 959
(Tex. Cit. App. 1954).
(j) State v. Willey, 360 S.W.2d 524,525 (Tex. 1962): CT Page 9694
 It has long been held that even though a tract of land is adaptable to subdivision for commercial lots and residential lots one seeking to prove the value of such a tract of land may not show what the price of lots would be if subdivided, or show the price for which already subdivided lots were selling.
(k) Arkansas State Hwy. Comm'n v. Watkins, 313 S.W.2d 86, 87-88 (Ark. 1958) (map showing approximately 70 lots of subject property placed in evidence over objection):
 It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used as a farm or is covered with brush or boulders. The measure of compensation is not, (emphasis supplied by court) however, the aggregate of the prices of the lots into which the tract could best be divided, (quoting language of NICHOLS, EMINENT DOMAIN (3rd ed.) 3142(1)). The measure of compensation is the market value of the land as a whole, taking into consideration its value for building purposes if that is its most available use.
 Conjecture about future lots in a subdivision "is universally condemned."
 The court, at p. 89, lists the numerous speculative matters that arise in determining the costs of creating a lot subdivision
Accord Arkansas State Hwy. Comm'n v. Allen, 484 S.W.2d 331, 332 (Ark. 1972); Arkansas State Hwy. Comm'n v. Spence,494 S.W.2d 469, 470 (Ark. 1973). CT Page 9695
(l) U.S. v. Easement Right of Way,123 F. Sup. 886 (USDC, N.H. Ga. 1954) (to same effect as NICHOLS quote).
(m) State Road Comm'n v. Ferguson, 137 S.W.2d 206, 210 (W.Va. 1964):
 Quoting NICHOLS. Measure of damages is not the aggregate of prices of lots into which the tract of land could be best divided. Citations to decisions in North Carolina, Florida, Alabama, Massachusetts, Illinois, and California.
(n) Coral-Glade Co. v. Board of Pub. Transp.,122 So.2d 587, 588 (Fla.App. 1960):
 It is not proper to speculate on what could be done to the land or what might be done to it to make it more valuable and then solicit evidence on what it might be worth with such speculative improvements at some unannounced future date.
 Quoting from Yoder v. Sarasota County, Fla., 82 So.2d 219, 221
(1955).
(o) Plaquemines Parish School Bd. v. Miller, 63 So.2d 6, 8 (La. 1953):
 "Lot method" approach to valuation disapproved where no indication owner ever contemplated subdivision into building lots. Such a subdivision would involve only speculation and would not be proper.
(p) Kerstetter Inc. v. Commonwealth171 A. 163, 164 (Pa. 1961):
 "Lot method" approach to valuation rejected. Court says: "It is proper to inquire what the tract [of undeveloped land] is worth, CT Page 9696 having in view the purposes for which it is best adapted, but it is the tract, and not the lots into which it might be divided, that is to be valued." (Quoting Pennsylvania Schuylkill Valley R.R. Co. v. Cleary, 17 A. 468, 470 (1889).)
(q) North Indiana Pub. Serv. v. McCoy.157 N.E.2d 181, 185 (Ind. 1959):
 (Quoting 4 NICHOLS, EMINENT DOMAIN (3d ed.) 12.3142(1)(a) and citing Pennsylvania Schuylkill Valley R.R. Co. v. Cleary, 17 A. 468, 470 (Pa 1989)). Disapproval of the "lot method" approach to evaluation of unimproved land.
 Accord First Nat'l Bank v. Penn Harris-Madison Sch. Corp., 237 N.E.2d 108, 110 (Ind. 1968).
(r) Toledo Edison Co. v. Roller,345 N.E.2d 430, 434 (Ohio App. 1974):
 The attempt to introduce into evidence the value of the land if actually divided into residential lots was improper, and the court did not err in sustaining the objection to this specific line of questioning, in that the cost of development, plus other factors entering into the value of the land after development, would be purely speculative.
2. Minicucci decides that owner's property was not adaptable for subdivision into building lots. It also stresses that an appraisal report relying on "lot sales" has only very questionable credibility.
3. Neither of plaintiffs' appraisers mentioned anything about the staggering stock market crash in October 1987 and its effect on the real estate market.